Good morning, Your Honors. Roy Axelrod on behalf of Petitioner National Steel and Shipbuilding Company. Your Honors, with all due respect, I believe the briefs adequately advised the Court of the issues and the law presented. However, I would like to emphasize, if I may, that a key issue in this case is whether a summary conclusion from a doctor which ignores uncontradicted evidence in the record constitutes substantial evidence in the record considered as a whole. In this case, that uncontradicted evidence establishes that claimant's work at Southwest Marine Swim as a rigger for approximately eight months required daily and repeated kneeling, squatting, and climbing, and frequent walking and standing. But didn't Dr. McSweeney say in his first two reports, both which preceded the litigation, that he could not make that determination and it was only after litigation that he did? Now, I'll agree Dr. Davidson was a little iffy at some points on his testimony as well, but it seems to me he's suggesting that the ALJ should have simply ignored that and just automatically accepted the revised testimony, which had its own problems in that Dr. McSweeney said he didn't know about the work at SWM, and yet his first report indicates he knew the kind of work that was being done there. So why should that just be ignored? Your Honor, with all due respect, I would submit that that should not be ignored, but rather Dr. McSweeney acknowledged at trial that his initial exam focused on the left shoulder. The ALJ criticized Dr. McSweeney for, in effect, indicating that Dr. McSweeney should have been aware of the duties of a rigger. However, with all due respect, Your Honor. Excuse me, counsel, one thing, and I'm sorry to interrupt, but at page 008, the job title reflected in Dr. McSweeney's report, rigger duties, the duties of the rigger involve constant standing, walking, lifting, et cetera, squatting, kneeling, all of those things that you have recited at infinitum in your brief. So Dr. McSweeney was aware of the kind of work that was being done at SWM, was he not? He was arguably aware, Your Honor, but again, as he indicated at trial, he was focusing on the left shoulder, and in fact, Your Honor, with all due respect, Dr. Davidson acknowledged in his deposition that when he initially examined the claimant, he focused on the left shoulder, and Dr. Davidson failed to ask the claimant, did you injure your left knee at NASCO? Did you aggravate your left knee at NASCO? Did your, excuse me, your right knee, did your right knee get worse? And if I may, Your Honor, one thing. Well, one thing. I'm confused now. I'm looking at the October 3, 1997 report, and it says, please be advised, Mr. Richard Avin, et cetera, was seen for the purpose of treating the right knee. That's what he was dealing with, the right knee. It's certainly in the October 3, 1997 report, and he also, he makes a misstatement in the 2000 report, refers to the left knee in relation to the 1995 accident. Obviously, he meant the right knee. So I don't understand your statement that he was focused on the shoulder. This was strictly the right knee as of 1997. With all due respect, Your Honor, Dr. McSweeney, Dr. Davidson, Dr. Fuller, and indeed even Dr. Averill, who issued a report and an opinion and did not testify, acknowledged that degenerative arthritis and a meniscus tear are aggravated by strenuous physical activity, namely kneeling, squatting, climbing. The summary conclusion of Dr. McSweeney in his initial opinion report fails to take that into account and basically ignores that. So the question, with all due respect, is can a summary conclusion, which ignores uncontradicted evidence that squatting, kneeling, climbing was involved and that those activities aggravate and make a simple meniscus tear more complex, which in turn requires more removal of the meniscus, which in turn accelerates the osteoarthritic changes. The only evidence on that, Dr. Davidson did at one point say that that would normally, that kind of activity could increase or enhance the meniscal tear, but then he later said there is no medical evidence. I mean, he said just basically living could do that, and there's no medical evidence to show that that is what happened. I don't think anybody here testified other than in response to hypothetical questions. Could this have happened? Is it the type of thing that could happen? Yes, but nobody could say to a medical certainty that that is in fact what happened. Davidson alludes to it, but then later retracts and says there's no medical evidence that that's what happened. If I may, Your Honor, can I quote from the supplemental excerpt of a record, page 147, at his deposition? Isn't it true, addressed to Dr. Davidson, that it's more likely than not a medical probability that his employment at Southwest caused further tearing of the meniscus, thus causing further or a greater amount of the removal of the meniscus? Answer, that is true. Question, the less meniscus that is within the knee provides less cushioning, which in turn accelerates the arthritic change. Is that correct? That is true. But subsequently he goes on again just to essentially retreat from that position and says there's no medical evidence here that that's in fact what happened. And so don't we wind up with a situation, I think you may be right, both experts are kind of all over the landscape here, and wasn't that a resolution on credibility for the ALJ and the Board? With all due respect, Your Honor, I would submit not, because the uncontradicted evidence establishes what the activities were and what the effect was. Finally, Your Honor, the ALJ and the BRB frankly applied an incorrect legal standard. The issue is not whether there was a significant aggravation as found by the judge. It would be anomalous to conclude that one day, one day of light-duty work aggravates a degenerative knee, as in Price, but eight months of strenuous physical activity involving kneeling, squatting, and climbing do not aggravate a similar degenerative knee. Thank you, Your Honor. I would like to reserve some time for rebuttal if I may. Thank you, counsel. Do you have a time allocation? Yes. I'm going to take two minutes, Your Honor. My name is Jeff Winter. I represent the claimant. And if I may just address it more from an outsider's perspective, if you will, simply because the only issue at stake for the claimant in this is if, in fact, Southwest Marine is found responsible, the AWW may be greater for my client. When a client comes into my office, the initial aspect is sort of like a legal triage, if you will, trying to decide which employer would be responsible. If, in fact, I do not decide which employer may accept the responsibility, we have one employer arguing against the other as to who's going to provide medical treatment and who's going to provide compensation. This delay, especially in medical treatment, causes great harm to claimants. And I don't think it's this panel's intent to vary from the Price decision or the Collada decision. And, Judge Chiavelli, if I may, Your Honor, direct your attention to the language in the Collada matter, you yourself just used earlier in response, could have. And I think that's key because the Collada court did say those exact words. The ALJ correctly applied, and I'm referring to the last paragraph in the Collada decision, the ALJ correctly applied the last responsible employer doctrine to the facts of this case and his findings that working conditions existed at General that could have aggravated Collada's injury is supported by substantial evidence. The problem is we also have McSweeney's testimony two times that it didn't. He states unequivocally that it didn't. And in Price, relied on heavily, didn't the court also say natural progression of the initial injury would have occurred? If it would have occurred, notwithstanding whatever happened, then we look to the first employer where it happened. And that was McSweeney's position twice. And he knew of what the work was at SWM. So I'm not sure. I agree with you if it was basically uncertain what happened where, and there was no contradictory testimony, and someone said if we have that last day rule that that would be sufficient. I agree. I wish it were that clear, especially in regards to the doctors, as far as them addressing causation early on in the cases. But most of the time they focus on treatment and not causation until specifically asked questions about causation. However, in order to make a more clear line and for employers to be able to more easily determine their liability, we don't want to put more emphasis on the natural progression, I think, than we do on could have. In other words, did the last employer expose the claimant to injurious stimuli? In this case, the answer is yes. In response to could that injurious stimuli have contributed or accelerated, the answer is yes. Under the case law as it stands today. Let me ask you hypothetically if a doctor said it could have, but I believe it didn't. No, Dr. Davidson. No, I'm saying hypothetically. Oh. Forget Dr. Davidson. But if someone said the SWM could have done it, but there's no medical evidence that it did, and if that were the testimony that it didn't happen, surely you're not saying the fact that it could have would override that. Well, if we look at the clear language of COLETA, I think yes. The answer is yes. However, if we want to make a clearer line, I think when we look at it has to be. We can't just say for a doctor to say, well, there's no evidence like Dr. Davidson said. There's no evidence that the employment at Southwest Marine did. Well, there's no evidence that it didn't. And when we have that kind of a situation where in this case we have the only MRI, the only determining factor of a torn meniscus occurred after the employment at Southwest Marine, there is no way by the facts of this case we can determine that the injury actually occurred at NASCO. Because Dr. Davidson said, well, the swelling and other things that occurred showed a torn meniscus. But if you read his deposition more clearly, he states that's what would naturally occur from arthritis. And so with his own testimony, it's equivocal at best in the rest of the testimony, but the clearest testimony that he gives is what Mr. Axelrod quoted to this court just a few moments ago. And with that test of could have, it makes a much clearer line for everyone to make a determination. And because of public policy and trying to assign things to the last responsible employer so that there is less litigation, so the claimant is not stuck in the middle between two employers, he is not denied medical treatment for a long period of time, I think we have to lean more heavily towards the last responsible employer, even in the language of CLATA, if it could have. And with that being the test, it makes everyone sit a little more easy in their position. Thank you. Thank you, counsel. Good morning. May it please the Court. Michael Duran on behalf of Southwest Marine. I'd like to respond immediately to things that have been raised before I touch on things I otherwise wanted to say. First of all, with regard to some of the comments of Mr. Axelrod, I think it's important to note that Dr. Davidson explains it is the meniscus repair surgery which is the really precipitating factor on the degenerative arthritis, and that clearly, that procedure was done as a result of the injury. And I'm also surprised to hear people saying it's in doubt that the traumatic injury at Southwest Marine caused the torn meniscus and the need for that treatment. That was determined as a – that was adjudicated by the California Workers' Comp Appeals Board. I don't think that's the issue. The issue here is the application of the last responsible employer rule, which is a harsh rule. Certainly. And let me respond to – Well, let me ask you a couple questions. First, in the record, we know it's really uncontradicted that he has swelling, he has symptoms on the job at Southwest. He's doing a job that even common sense would say you're going to aggravate this prior injury by squatting, lifting, climbing, all the activities he did at Southwest. You have good notes from Dr. McSweeney, but then he recants that in his testimony and says, now that I've looked at everything, I'm going to apportion. So you have then Dr. Davidson is what you rely on, and then even he concedes that some of that activity is going to aggravate. Given that harsh rule, aren't you stuck? Not really, because in the Caleda and Foundation Constructor cases, when they stated the two-injury rule, they did not include the word permanent. But when this court in the Price decision restated the rule and asserted the word permanent in front of the word disability, which would seemingly alleviate some of the harshness when all you have are ups and downs and symptoms that do not change the underlying condition, you're going to avoid the very type of litigation that would delay benefits to the injured worker by, in fact, you're creating fights among the employers if you're allowing them to fight over temporary increases, ups and downs in the symptoms when the medical evidence is it did not affect permanently the underlying condition causing the disability. Ultimately, we had Dr. McSweeney saying it did after he reviewed the notes of others and re-reviewed what was the conduct at SWM. You even had Dr. Davidson saying, as was quoted earlier in the record, that at the very least it could have, and I think it was medical probability was the language he acceded to and certainly suggested the tear would have increased, which would have had other impacts on the knee and indeed on the arthritic condition. And that was to be expected with the kind of work and the nature of the twisting that was done at SWM. Unfortunately, Dr. Davidson just finished answering a long string of hypothetical questions, and truly I believe he wasn't even aware that Mr. Axelrod had shifted. The confusion exception. But be that as it may, this was Judge Pulver's job to sort this all out. And to a large degree, both Dr. Fuller and Dr. McSweeney were relying, simply adopting statements made by Richard Avant and his testimony, the impeachment of his testimony, was a major issue of this trial. So what we're talking about is the job that Judge Pulver had to do in sorting out the facts, the weight of the evidence, the convincing force. And I think the whole exercise here is to try and take that away from him. And that is not this Court's job. Perhaps. But what significance is it that Dr. McSweeney was the operating physician, the treating physician? Well, the significance is during the period of time. The examining physician, Dr. Davidson. Well, during the time that Dr. Davidson was acting as the treating physician, he was saying unequivocally, it was a specific injury at NASCO which was the sole cause. It was only when he was later on an expert witness at trial, being a retained expert to testify, that he suddenly changed his testimony. And he changed it based solely on testimony of Richard Avant, which had been substantially impeached during the trial proceedings. Therefore, both Dr. Fuller and Dr. McSweeney are relying just on impeached, shaky testimony of subjective complaints going up and down. And the rule, as stated in Price, is that you need to look for a permanent disability that's been increased, not temporary fluctuations in symptoms. Because if that is not clarified, if that is not made clear that Judge Pulver did the right thing in this case, you're only going to further defeat the very policy behind the last responsible employer rule by increasing the incentive of employers to fight over trying to dump it off onto the last guy. Simply because he worked there, his pain went up, I'm off the hook. And we're seeing a lot of that already. And I think it needs to be made clear that when the trial judge, as a matter of fact, follows the rule and decides was it natural progression or was it a permanent aggravation, if he decides that. But if the work at SWM at the very least increased the tear more than would have occurred naturally and required greater surgery, had greater impact, you're saying that's not, would that be temporary or permanent? That would be permanent. But that was not established as a matter of fact. Dr. Davidson conceded hypothetically it could have happened. He was asked a lot of hypothetical questions that he answered to the best of his ability. But the facts are that all he sees is increase in symptoms due to increased activity, which is to be expected when you've got a torn meniscus in there that hasn't been treated. That doesn't mean you've really affected the torn meniscus. And then it was the surgery on the torn meniscus that was really the precipitating factor in making the degenerative arthritis a disabling condition leading to knee replacement surgery. And I really don't think that it's going to accomplish anything if we're going to be second-guessing the trial judges all the time on their factual determinations that then lead to their application of the price-to-injury rule. Thank you. Thank you very much. Yes. If I may, Your Honor. Thank you. Two points. A conclusion, as determined by the administrative law judge in this case, that the slim employment did not aggravate the claimant's right knee condition, not only defies common sense, it's inherently incredible and patently unreasonable. And that is the standard that this Court uses pursuant to Cadero. Secondly, Your Honor, under this Court's ruling in Amos, special deference is in fact due to the opinion of the treating physician. In this case, Dr. McSweeney, who testified at trial that the slim employment not only aggravated, but indeed accelerated the disability in claimant's right knee. Thank you. The case just heard will be submitted.
judges: Farris, Thomas, Schiavelli